**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **ALAN DINN & ROBIN DINN,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. C-08-309** |
| | § | |
| **HOOKING BULL BOATYARD, INC.,** | § | |
| | § | |
| **Defendant.** | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This admiralty action for breach of contract and violation of the Texas Deceptive Trade Practices Act arises from a contract to paint and perform repairs to a racing yacht. The Court presided over a non-jury trial that began on December 2, 2009. The following day, the evidence concluded, the Parties rested, and the Court heard the arguments of counsel.  After considering the testimony of the witnesses, the exhibits in evidence, the arguments and briefs of counsel, and the applicable law, the Court makes the following findings of fact and conclusions of law.[1]

**Findings of Fact**

(1)    Defendant Hooking Bull Boatyard, Inc. ("Defendant") is owned by James and Georgia Jordan. Mr. Jordan is Defendant's principal. (*See* Joint Pretrial Order, Dkt. No. 80, Section F, Admission of Fact No. 13.)

(2)    Although Defendant allows "do-it-yourselfers" to perform work on their own vessels while on Defendant's premises, Defendant is primarily engaged in the business of hauling out and performing maintenance work on marine vessels.

---

1.  To the extent that any conclusion of law is more properly characterized as a finding of fact, and vice versa, the Court adopts it as such.

(3)     Defendant has two full-time employees, Mr. Jon Gatlin and Mr. Danny Dubose, who both perform repair and paint work on vessels.  Mr. Gatlin primarily does fiberglass repair work and above-waterline paint jobs.  Mr. Dubose primarily performs below-waterline paint jobs and mechanical repair work.  Defendant has a part-time employee, Mr. Brendan Briggs, who assists Mr. Dubose.  Mr. Jordan also does work on clients' boats. Any and all actions of Defendant's employees—Mr. Gatlin, Mr. Dubose, Mr. Jordan, and Mr. Briggs—were performed in the course and scope of their employment with Defendant. (*See* Admission of Fact No. 20.)

(4)     Plaintiffs Alan and Robin Dinn ("Plaintiffs") are the owners of a 45' custom Harris racing yacht, S/V CURANDERO.  (*See* Admission of Fact No. 1.)

(5)     On January 22, 2008, Plaintiffs and Defendant entered into a contract to perform repair and painting work to the CURANDERO (the "Contract") (Pl. Ex. 1).  (*See* Admission of Fact No. 1.) The Contract was on a pre-printed form that had been prepared for Defendant by a law firm in Corpus Christi, Texas. Plaintiffs were not given the opportunity to negotiate or otherwise make any amendments to the terms of the Contract.

(6)     Mr. Dinn requested that Defendant:  (a) repair certain cracks and imperfections in the hull; (b) prepare, prime, and apply the below-waterline hull and keel with antifouling paint (known as a "bottom job"); (c) prepare, prime, and repaint the above-waterline hull, and (d) re-fabricate and replace the rub rails on the vessel.

(7)     Mr. Jordan contacted Mr. Dinn to indicate when Plaintiffs should bring the CURANDERO to Defendant's premises. (*See* Admission of Fact No. 22.) Plaintiffs delivered the CURANDERO to Defendant on January 22, 2008. (*See* Admission of Fact No. 2.) When Plaintiffs arrived, Mr. Jordan instructed Plaintiffs to leave the CURANDERO in the haul-out slip

so that Defendant could haul the boat the next day when the tides were higher and there was more daylight.

(8)     The following day, Mr. Dinn returned to Defendant's premises to ensure that the haul-out was successful. Near the haul-out slip, Mr. Dinn noticed a 20' sailboat that was painted with purple metallic paint.  Mr. Dinn asked Mr. Jordan about the boat because he wanted the CURANDERO painted with the same type of metallic paint. Mr. Jordan informed Mr. Dinn that the sailboat belonged to his wife, Mrs. Georgia Jordan, and that it had been painted by Defendant's boat painter, Mr. Gatlin. Mr. Jordan did not take Mr. Dinn over to Mrs. Jordan's boat or otherwise use Mrs. Jordan's boat to show Mr. Dinn the quality of work that Defendant could perform.

(9)     Shortly thereafter, Mr. Dinn asked Mrs. Jordan what kind of paint was used on her boat. Mrs. Jordan informed Mr. Dinn that her boat was painted with Awlgrip®/Awlcraft® (hereinafter referred to as "Awlcraft®")[2] metallic paint. Mrs. Jordan then handed an Awlcraft® paint chart to Mr. Dinn and told him to "pick any color" or words to that effect.  After taking the paint chart home and discussing the color choices with his wife, Mr. Dinn decided to have the CURANDERO painted with Awlcraft® Metallic Aquamarine paint, which was a similar shade to the paint that was on the CURANDERO at that time. Mr. Dinn did not purchase paint from Defendant, but instead informed Mrs. Jordan that he would supply the paint.

(10)     Mr. Jordan testified that he told Mr. Dinn that Awlcraft® metallic paint was a new paint, and the only boat Defendant's employees had ever painted with Awlcraft® metallic paint was the boat belonging to Mrs. Jordan. (Tr. at 297.)[3] Mr. Dinn testified that Mr. Jordan did not

---

2.  Awlcraft® is simply a sub-brand of the overall Awlgrip® brand.
3.  Any citation to "Tr." refers to the Trial Transcript (Dkt. Nos. 88 & 89).

tell him that his wife's boat was the only boat that any of Defendant's employees had ever painted with a metallic paint. (Tr. at 83.)

(11)    Throughout the remainder of January and February 2008, Defendant sanded and worked to repair the cracks and imperfections in the hull of the CURANDERO. Plaintiffs also visited Defendant's premises through this time period to perform work on their vessel. Defendant did not begin priming or painting the CURANDERO during this time period for two reasons: (1) because of the other vessels on which Defendant was working; and (2) because of the less-than-desirable weather conditions that existed at the time.

(12)    On or about March 11, 2008, Mr. Dinn called Defendant's office phone and instructed Defendant to stop working on the CURANDERO because its employees were taking too long. Instead, Plaintiffs asked Jimmy Sanchez, a local boat painter who had performed work for them before, to paint the CURANDERO.

(13)    On or about March 23, 2008, Mr. Sanchez came to Defendant's premises to inspect the CURANDERO. After Mr. Sanchez informed Plaintiffs that he could not paint the CURANDERO on Defendant's premises due to problems with his insurance company, Mr. Dinn informed Mr. Jordan that Defendant was back on the job.

(14)    On or about March 25, 2008, Mr. Dinn provided Defendants with the paint he wanted used on the CURANDERO. He delivered Pettit Trinidad® Pro 75 antifouling paint (hereinafter "Pettit Trinidad®") for the bottom job and Awlcraft 2000® F4342 Aquamarine Metallic paint (hereinafter "Awlcraft® paint") for the above-waterline job.

(15)    On or about April 20, 2008, Defendant first attempted to paint the above-waterline hull of the CURANDERO with the Awlcraft® paint. The resulting paint job had a tiger-striped appearance. Mr. Jordan attempted to call Plaintiffs three times on April 22, 2008 to inform them

about the problems with the paint, but Plaintiffs were in the Bahamas on vacation and missed Mr. Jordan's calls.

(16)    Shortly after the first paint job, Mr. Dinn came to Defendant's yard to inspect the appearance of the CURANDERO and to discuss what had happened with Mr. Jordan.  Mr. Jordan admitted that the finished appearance was unacceptable and told Mr. Dinn that Defendant would repaint the above-waterline hull of the vessel and would pay for the paint and materials. Mr. Dinn agreed to this course of action.

(17)    Between May 21 and May 28, 2008, Mr. Dubose performed a bottom job on the CURANDERO with the assistance of Mr. Briggs. The two men fixed voids in the keel, lightly sanded the bottom of the boat, and used rollers to apply one coat of Pettit Trinidad® to the bottom hull and keel area.

(18)    On or about May 29, 2008, Defendant applied the second coat of Awlcraft® paint to the CURANDERO's above-waterline hull. The second attempt to apply the Awlcraft metallic paint was also unsuccessful, and the boat was still tiger-striped. (*See* Admission of Fact No. 11.) Small imperfections—or "blisters"—also began to appear in the paint at this time.

(19)    On or about May 30, 2008, Mr. Dinn came to Defendant's yard to inspect the appearance of the CURANDERO and told Mr. Jordan that the appearance of the CURANDERO was again unsatisfactory.

(20)    From June 1 to July 11, 2008, Defendant did not perform any work to the CURANDERO because of two potential hurricanes that were predicted to make landfall near Rockport, Texas. Instead, Defendant was busy preparing and protecting its boatyard and the other vessels it already had in its boatyard for the potential hurricanes.

(21)    On or about July 11, 2008, Defendant began fabricating new rub rails. Mr. Dinn provided Mr. Jordan with drawings and specifications for the new rub rails, as well as one of the CURANDERO's old rub rails to use as a model. Mr. Dinn also provided Defendant with plastic decking material for Defendant to use in constructing the new rub rails.

(22)    On or about July 16, 2008, Mr. Briggs and Mr. Dubose applied a second coat of Pettit Trinidad® paint to the bottom hull and keel area.

(23)    Between July 18 and July 24, 2008, Defendant's employees began installing the new rub rails, repaired the blisters that appeared on the hull after the second coat of Awlcraft® paint was applied, and spot painted the hull with Awlcraft® paint where the blisters had been repaired.

(24)    On or about July 25, 2008, Mr. Dinn came to Defendant's yard to inspect the CURANDERO.  Mr. Dinn was still unhappy with the appearance of the above-waterline paint job. Mr. Jordan offered to repaint Plaintiffs' vessel, at Defendant's expense, with flat-colored paint, but Plaintiffs refused. (*See* Admission of Fact No. 13.) Instead, Mr. Dinn told Mr. Jordan to finish installing the rub rails so that he could get the CURANDERO back in the water because he and Mrs. Dinn were sailing in a regatta the following week.

(25)    On July 28, 2008, before he would agree to put the CURANDERO back in the water, Mr. Jordan presented Plaintiffs with invoice number 1599 in the amount of $7905.00. The invoice was for lay days in July, painting and sanding the hull (both above and below the waterline), rub rail repairs, and labor charges. Plaintiffs paid this invoice when it was presented (*See* Admission of Fact No. 8), although Mr. Jordan had previously told Mr. Dinn that the second coat would be at Defendant's expense. Defendant then redelivered the S/V CURANDERO to Plaintiffs. (*See* Admission of Fact No. 3.)

(26)    In early August 2008, Plaintiffs obtained an estimate from Gulf Coast Composite, a boatyard located in Kemah, Texas, (near Houston) for the repair work that they desired on the CURANDERO. The estimate was for $20,188.63. (*See* Admission of Fact No. 14.)

(27)    On August 29, 2008, Plaintiffs sent a demand letter to Defendant stating they were unhappy with the quality of Defendant's work and demanding payment in the amount of $20,188.63, which reflected the amount of the estimate from Gulf Coast Composite. (*See* Admission of Fact No. 15.) Defendant refused to pay the amount demanded by Plaintiffs but again offered to repaint the CURANDERO at Defendant's expense. (*See* Admission of Fact No. 16.) Plaintiffs again refused Defendant's offer to repaint the vessel. (*See* Admission of Fact No. 17.)

(28)    On September 25, 2008, Plaintiffs brought this action alleging that Defendant breached its implied and express warranties in violation of the Texas Deceptive Trade Practices Act (DTPA), and also breached the Contract by failing to perform the above-waterline paint job, bottom job, and replacement of the rub rails in a timely and workmanlike manner.

**A.  Timeliness**

(29)    The Contract did not provide a completion date for the work, but instead provided, "Any completion date give to customer is valid only if received in writing and signed by Hooking Bull Boatyard." (Pl. Ex. 1, ¶ 24.)

(30)    Mr. Dinn testified that he believed the repairs and paint job would take 6-10 weeks. (Tr. at 35.) However, he admitted that no completion date was given to him either orally or in writing. (Tr. at 85.)

(31)    Mr. Dinn contributed to delaying Defendant's performance of the Contract by pulling Defendant off the job for roughly two weeks and by failing to provide Defendants with the

necessary paint until roughly two months after he delivered the CURANDERO to Defendant's premises.

**B. Above-waterline paint job**

(32)    There is no dispute that the above-waterline paint jobs performed by Defendant were substandard. This was freely admitted by Mr. Jordan and Defendant's liability expert, Michael Firestone. Even Mr. Gatlin, who painted the boat, acknowledged that the paint job was "very bad" and "pretty ugly." (Tr. at 149 & 210.) However, the Parties and their experts disagree as to what caused the tiger-striping, blisters, and halos to appear on the CURANDERO's hull.

(33)    The Court finds that Defendant's failure to adhere to the application guidelines provided by Awlgrip® with respect to its Awlcraft® metallic paint ultimately caused the tiger-striping and blisters in the CURANDERO's paint job, and but for the blisters and their subsequent repair, the halos would not have formed.

**1. Tiger-striping**

(34)    It is extremely important, especially in the climate that exists in South Texas, that sailboats are painted in the most optimal weather conditions possible—low humidity, low wind speed, and air temperature that is neither too hot nor too cold. This is especially true with metallic paints.

(35)    With respect to the first painting attempt, the report of Defendant's liability expert, Mr. Firestone, states, "During the painting process, it became evident that the hullsides were too hot, and that the paint was not laying-down properly; it had 'Tiger-striped,' that is, the metallic content of the paint had not layed-down evenly, resulting in a striped effect at areas along the hullsides." Mr. Firestone further concluded that the tiger-striping that resulted after the second painting attempt was also due to the temperature being "higher than ideal." (Def. Ex. 15 at 4.)

(36)   Mr. Jordan contacted the regional Awlgrip technical sales representative, who confirmed that the hullsides may have been too hot to allow proper application of the paint. (Def. Ex. 15 at 5.) Mr. Jordan also admitted in a letter to his insurance company that the weather was too windy the first time Mr. Gatlin attempted to paint the CURANDERO and too hot during the second attempt. (Def. Ex. 2 at 2.)

### 2.  Blisters

(37)   The Awlcraft® application guidelines warn that if the hull is improperly prepared, or if moisture levels are too high or there is water present on the hull, "blistering" can occur. (Pl. Ex. 5 at 10.) To prevent moisture from contaminating the surface, the guide instructs users to, "[w]henever feasible, erect some kind of shade or cover over the work area." (Pl. Ex. 5 at 10.) Mr. Jordan testified that he was aware that a shade or cover should be erected, but he chose to ignore the manufacturer's recommendations. (Tr. at 247.)

(38)   The Awlcraft® application guidelines also warn that before painting, a cross-hatch adhesion test, solvent resistance test, and coating compatibility test should be performed. (Pl. Ex. 5 at 12—14.) The guidelines explicitly warn users: "Please take this testing seriously . . . . Diligence in performing these tests can save hours of costly labor, down time, and wasted materials." (*Id.* at 11.) Mr. Gatlin testified that he was not aware that these tests should be performed because he did not read the application manual before painting the CURANDERO. (Tr. at 176—177.) Mr. Jordan testified that he was aware of these tests but chose not to perform them. (Tr. at 249.)

(39)   There is insufficient evidence to support Defendant's speculation that the blisters were caused by water that had been trapped in the CURANDERO's hull. Moisture readings taken by Mr. Firestone did not confirm the presence of water in the hull of the vessel. Moreover,

by the time the blisters appeared, the CURANDERO had been out of the water for over 90 days, and if water in the hull was going to cause blistering, then it would reasonably be expected to have occurred after the first coat of Awlcraft® paint was applied.

### 3. Halos

(40)    Mr. Firestone's report states that the halos that appeared in the paint's finish were caused by Defendant repairing and spot painting over the blisters in the paint. (Def. Ex. 15 at 4.) Mr. Jordan and Mr. Gatlin also testified that spot painting with metallic paint is not advised because it causes halos to appear. (Tr. at 214 & 250—51.)

(41)    Mr. Jordan testified that Mr. Dinn ordered him to spot paint the vessel to cover up the blisters (Tr. at 250), and Mr. Gatlin testified that he overheard Mr. Dinn tell Mr. Jordan he wanted the paint spotted in (Tr. at 213). Mr. Dinn first testified that he could not remember if he told Mr. Jordan to spot paint the CURANDERO. (Tr. at 58), but later testified that he never told Mr. Jordan to spot paint the CURANDERO (Tr. at 101).

(42)    The Court finds that Mr. Dinn did instruct Mr. Jordan to spot paint the vessel. However, Mr. Dinn is not a boat painter by profession, and Defendant has presented no evidence that Mr. Gatlin, Mr. Jordan, or any of Defendant's employees informed Mr. Dinn that spot painting with metallic paint would cause halos.

### C.  Bottom Job

(43)    Mr. Dinn testified that the bottom job was unacceptable because the surface was too rough. (Tr. at 22.) Mr. Dinn also testified that the level of marine growth on the underside of the CURANDERO was higher than he expected, and it appeared that there was very little bottom paint on one particular part of the boat. (*Id.* at 61.)

### 1. Roughness

(44)    Mr. Dinn testified that the bottom paint appeared as though it had been applied with a roller. (Tr. at 22.) Mr. Dinn further testified that Mr. Sanchez usually performs bottom jobs for Plaintiffs using a paint brush, and they usually come out smooth. (Tr. at 23.)

(45)    The expert report of Plaintiff's expert, Col. Andy Ficken, states that because Plaintiffs race the CURANDERO, it should have a smooth finish on the bottom. Instead, the bottom was rough and had the feel and appearance of sandpaper. (Pl. Ex. 30 & 31.)

(46)    Mr. Firestone's report states that the industry standard for performing a bottom job consists of sanding the vessel's bottom and then applying the antifouling paint with a nap roller. A "race bottom," to which Col. Ficken refers, requires much greater surface prep work, and after the antifouling paint is sprayed on the bottom, it is sanded with a very fine grit sandpaper or burnished with bronze wool. This yields a glass-like smooth finish. However, a racing bottom costs roughly three times more than a standard bottom job, and if an owner desires a race bottom, it must be requested. (Def. Ex. 15 at 9—11.)

(47)    Mr. Dinn testified that he did not request a race bottom, but instead asked for a regular bottom job. (Tr. at 91.) Moreover, the estimate that Plaintiffs obtained from Gulf Coast Composites specifies that the antifouling paint will be rolled on, not applied with a brush.

### 2. Marine Growth

(48)    Col. Ficken's report states that, during the Parties' joint inspection of the CURANDERO on November 3, 2008, there were barnacles on the propeller and shaft. The propeller and shaft were supposed to be coated with antifouling paint, but it appears this had not been done. (Pl. Ex. 31.)

(49)    Mr. Firestone's report states that although there is some paint missing from the propeller, areas of the strut, and at the skeg's rudder bracket, this is normal because antifouling paint does not adhere well to the metal fittings, and when the engine is operated and the propeller turns, paint is flung off the blades. Overall, Mr. Firestone concluded that the "bottom's painted finish was of acceptable condition and quality." (Def. Ex. 15 at 10.)

(50)    The Court finds the opinion of Defendant's expert to be reliable and credible. Accordingly, the Court finds that the bottom job performed by Defendant was acceptable under industry standards.

**D.  Rub Rails**

(51)    Mr. Dinn testified that the rub rails were not "finished correctly" because the old rub rails were tapered down to the hull, and the re-fabricated rub rails were not. Although Mr. Dinn admits that this is an "issue of aesthetics," he claims he is "going to have to pay someone else to finish what Defendant started." (Tr. at 42—43.)

(52)    Mr. Jordan testified that Defendant's employees were unable to create new rub rails exactly like the CURANDERO's old teak rub rails because of the way Mr. Dinn wanted them installed. The only way to fabricate the rub rails to Mr. Dinn's exact specifications would be to use wood instead of the plastic decking material Mr. Dinn provided. (Tr. at 292—94.)

(53)    Mr. Firestone's report states that although teak is the industry standard for rub rails, the plastic rub rails were properly installed and the workmanship was good. (Def. Ex. 15 at 3.)

(54)    Plaintiffs did not offer any expert testimony from Col. Ficken regarding the rub rails, and neither estimate obtained by Plaintiffs from Gulf Coast Composites includes an estimate for replacing or otherwise modifying the rub rails.

(55)    The Court finds that the rub rails, as re-fabricated and installed by Defendant, were acceptable under industry standards.

**E.  Damages**

(56)    Defendant presented Plaintiffs with invoices totaling $18,161.16. (*See* Admission of Fact No. 9.) Plaintiffs paid $18,161.16 to Defendant to satisfy the invoices. (*See* Admission of Fact No. 10.)

(57)    On August 12, 2008, Gulf Coast Composite estimated it would cost $20,188.63 to repaint and repair the CURANDERO. (Pl. Ex. 31 at 3.) This estimate included a $1,125 charge for painting a cove stripe. The cove stripe was not mentioned in the work order for services to be performed by Defendant, and Plaintiffs have presented no evidence that they were charged by Defendant for this service.

(58)    On September 12, 2009, Gulf Coast Composite estimated it would cost $24,606.15 to repaint and repair the CURANDERO. (Pl. Ex. 46.) This estimate did not include a charge for painting a cove stripe.

(59)    Both Mr. Firestone and Col.  Ficken agree that the increase in cost between the first and second estimates includes factors related to increases for labor and materials due to Hurricane Ike, which hit Houston in September 2008.

**Conclusions of Law**

**I.  Jurisdiction**

(1)    "It is well settled that a contract to repair a vessel is maritime." *Alcoa S.S. Co. v. Charles Ferran & Co.*,  383 F.2d 46, 50 (5th Cir. 1967) (citing *North Pacific Steamship Co. v. Hall Brothers Marine Railway & Shipbuilding Co.*, 249 U.S. 119 (1919); 1 BENEDICT ON ADMIRALTY, § 66 n.32 (6th ed., 1966 Supp. by C. R. Knauth)).

(2)     Subject matter jurisdiction over Plaintiffs' breach of contract claim is granted to the Court by 28 U.S.C. § 1333, which provides in part: "The district courts shall have original jurisdiction, exclusive of the courts of the States, of [a]ny civil case of admiralty or maritime jurisdiction . . . ." 28 U.S.C. § 1333(1).

(3)     Supplemental subject matter jurisdiction over Plaintiffs' state law DTPA claims is granted to the Court by 28 U.S.C. § 1367(a).

## II.  Choice of Law

(4)     Under federal maritime law, "where the parties have included a choice of law clause, that state's law will govern unless the state has no substantial relationship to the parties or the transaction or the state's law conflicts with the fundamental purposes of maritime law." *Stoot v. Fluor Drilling Services, Inc.*, 851 F.2d 1514, 1517 (5th Cir. 1988). *See also Hale v. Co-Mar Offshore Corp.*, 588 F. Supp. 1212, 1215 (D.C. La. 1984); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2) (1971).

(5)     The Contract contains a choice-of-law provision that states: "This agreement shall be construed and interpreted and the legal relations created hereby shall be determined in accordance with the laws of the State of Texas." (Pl. Ex. 1, ¶ 21.)

(6)     Texas has a substantial relationship to the Parties in this case, all of which are Texas residents, and the Contract was formed and was to be performed in Texas. Application of Texas law in these circumstances would not be contrary to the fundamental policies of maritime law.

(7)     The Court will look to Texas substantive law to determine the contract remedies available to Plaintiffs as well as resolving Defendant's counterclaim for attorney's fees.

### III.  Breach of Contract

(8)     The elements of a breach of contract claim under Texas law are: (1) there is a valid and enforceable contract; (2) the plaintiff is a proper party to sue for breach of the contract; (3) the plaintiff performed, tendered performance, or was excused from performing its contractual obligations; (4) the defendant breached the contract; and (5) the defendant's breach caused the plaintiff's injury.  *Winchek v. American Express Travel Related Servs.,* 232 S.W.3d 197, 202 (Tex.App. – Houston [1st Dist] 2007, no pet.); *Doss v. Homecoming Fin. Network, Inc.*, 210 S.W.3d 706, 713 (Tex.App.—Corpus Christi 2006, pet denied); *Hackberry Creek Country Club, Inc., v. Hackberry Creek Home Owners Ass'n,* 205 S.W.3d 46,55 (Tex.App.—Dallas 2006, pet. denied).  "Breach" is the failure, without legal excuse, to perform any promise that forms all or part of an agreement. *Bernal v. Garrison*, 818 S.W.2d 79, 83 (Tex. App.—Corpus Christi, 1991 writ denied.)

(9)     There is a valid and enforceable contract between Plaintiff and Defendant. (Pl. Ex. 1.)

(10)     Plaintiffs, as owners of the CURANDERO and parties to the Contract, are proper parties to sue for breach of the Contract.

(11)     Plaintiffs fulfilled their contractual obligations by paying $18,161.16 to Defendant to satisfy all invoices.

(12)     Plaintiffs allege that Defendant breached the Contract by failing to timely and properly: (1) sand and fill in dings in the hull of the CURANDERO; (2) apply rub rails to the CURANDERO; (3) sand and repaint the above-waterline hull of the CURANDERO, and (4) perform a "bottom job" on the CURANDERO.

### A.  Timeliness

(13)    The Contract did not provide a completion date for the work, and Mr. Dinn admitted that no completion date was given to him either orally or in writing. (Tr. at 85.)

(14)    Where a contract does not set an exact time or date for performance, the law will imply that performance must occur within a reasonable time. *HECI Expl. Co. v. Clajon Gas Co.¸* 843 S.W.2d 622, 634 (Tex.App.—Austin 1992, writ denied).

(15)    Although Plaintiffs may consider six months to be an unreasonable period of time for Defendant to perform the work they requested, the Court cannot find that six months was unreasonable as a matter of law, especially where factors outside Defendant's control—namely the weather and Plaintiffs themselves—contributed to the delay.

(16)    The Court finds that Defendant did not breach the Contract by failing to perform its duties in a timely manner.

### B.  Sanding and Filling in Dings

(17)    Plaintiffs have failed to offer any evidence that Defendant failed to properly sand or fill in any dings in the hull of the CURANDERO.

(18)    The Court finds that Defendant not breach the Contract with respect to sanding and filling in dings.

### C.  Above-waterline Paint Job

(19)    The evidence establishes Defendant's breach through the admissions of its principal, painter, and liability expert, who all testified that the above-waterline paint job was unacceptable and failed to meet Plaintiffs' reasonable expectations. Regardless of the cause of the blisters and halos, Mr. Jordan admitted that tiger-stripping alone is not acceptable for a paying customer.

(20)    The finished appearance of the vessel is a material term of the Contract.

(21)     Defendant breached the Contract by failing to perform the above-waterline paint job in an acceptable manner.

(22)     Defendant's breach was the producing cause of Plaintiffs' injury.

**D.  Bottom Job**

(23)     The evidence establishes that the bottom job was of acceptable condition and quality, and it was performed in compliance with industry standards. Although Col. Ficken testified that the bottom job "violated industry standards," he failed to provide the particular standard or factual bases for how the bottom job failed to meet those standards. Col. Ficken's testimony was conclusory and amounted to "pure speculation," and is therefore inadmissible.  *See Benavides v. County of Wilson*, 955 F.2d 968, 973 (5th Cir. 1992).

(24)     The Court finds that Defendant did not breach the Contract with respect to the bottom job.

**E.  Rub Rails**

(25)     The evidence establishes that the rub rails were properly installed, the workmanship was good, and the rails were acceptable under industry standards.

(26)     Defendant did not breach the Contract with respect to re-fabricating and replacing the rub rails.

**IV.  DTPA**

(27)     Section 17.50 of the DTPA provides that a consumer may maintain an action where a defendant's breach of an express or implied warranty constitutes a producing cause of economic damages or mental anguish. TEX. BUS. & COMM. CODE §17.50(a)(2).

**A.  Breach of Implied Warranty**

(28)    To recover on a claim of breach of implied warranty under the DTPA, a plaintiff must prove the following: (1) the plaintiff was a consumer; (2) there was an implied warranty; (3) the warranty was breached; and (4) the breach was a producing cause of the plaintiff's damages. *U.S. Tire-Tech v. Boeran*, 110 S.W.3d 194, 197 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).

(29)    The DTPA defines a consumer as "an individual . . . who seeks or acquires by purchase or lease, any goods or services."  Tex. Bus. & Comm. Code §17.45(4).  The Plaintiffs are "consumers" within the meaning of the DTPA. (*See* Agreed Proposition of Law No. 8.)

(30)    Texas law recognizes "an implied warranty to repair or modify existing tangible goods or property in a good and workmanlike manner [for] consumers suing under the DTPA." *Melody Home Manufacturing Co. v. Barnes*, 741 S.W.2d 349, 354 (Tex. 1987).  Therefore, the Court finds that there was an implied warranty with respect to the painting and repair work Defendant did to the CURANDERO.

(31)    Good and workmanlike manner is defined "as that quality of work performed by one who has the knowledge, training, or experience necessary for the successful practice of a trade or occupation and performed in a manner generally considered proficient by those capable of judging such work." *Melody Home*, 741 S.W.2d at 354.

(32)    The above-waterline paint job provided by Defendant failed to meet the minimum standard "as that quality of work performed by one who has the knowledge training or experience necessary."  Defendant's principal, its painter, and its own expert each admit that the final appearance of the CURANDERO was unacceptable to them and/or unacceptable by industry standards.  Defendant took on a job it was not equipped to perform, failed to require its

employees to read and/or adhere to the guidelines provided in the Awlcraft® application guide, and generally failed to produce acceptable results.

(33)    It is immaterial whether Mr. Jordan informed Mr. Dinn that Defendant's employees had only painted one other boat with Awlcraft® metallic paint, as the implied warranty of good and workmanlike manner may not be waived or disclaimed. *See Melody Home Manufacturing Co.* v. Barnes, 741 S.W.2d 349, 355 (Tex. 1987).

(34)    The Court finds that Defendant breached its implied warranty of workmanlike performance with respect the above-waterline paint job to the CURANDERO, and this breach was the producing cause of Plaintiffs' economic damages. Defendant is therefore liable to Plaintiffs for breach of implied warranty under the DTPA.

## B.  Breach of Express Warranty

(35)    Plaintiff claims that Mr. Jordan's statement that he had "the best boat painter in the region" constitutes an express warranty, which Defendant breached.

(36)    To recover on a claim of breach of express warranty under the DTPA, a plaintiff must show the following: (1) the plaintiff was a consumer; (2) there was an express warranty; (3) the warranty was breached; and (4) the breach was a producing cause of the plaintiff's damages. *Church & Dwight Co., Inc. v. Huey*, 961 S.W.2d 560, 568 (Tex. App.—San Antonio 1997, rev. denied); *McDade v. Texas Commerce Bank, Nat'l Ass'n*, 822 S.W.2d 713, 718 (Tex. App.—Houston [1st Dist.] 1991, writ denied).

(37)    An express warranty is created when a seller makes any affirmation of fact or promise to the purchaser that relates to the sale and becomes part of the basis of the bargain that the product shall conform to the affirmation or promise. TEX. BUS. & COMM. CODE § 2.313(a). An express warranty may also be created when the seller uses any sample or model that becomes

part of the basis of the bargain that the goods shall conform to the model. *Id.* "It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty." *Id.* § 2.313(b).

(38)    A statement that expresses mere "puffing" is not actionable under the DTPA. *Autohaus, Inc. v. Aguilar*, 794 S.W.2d 459, 462 (Tex. App.—Dallas 1990, *writ denied per curiam.*) "Puffery" is an expression of opinion by a seller not made as a representation of fact. *Dowling v. NADW Marketing, Inc.*, 631 S.W.2d 726, 729 (Tex. 1982) (citing *Gulf Oil Corp. v. Federal Trade Comm'n*, 150 F.2d 106, 109 (5th Cir. 1945)). Three factors are considered in determining whether a representation is mere puffing: (1) the specificity of the representation; (2) the comparative knowledge of the buyer and seller; and (3) whether the representation relates to a future event or condition. *GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 889 (Tex. App.—Austin 2008).    Texas courts have held that statements describing a good or service as "superb," "superfine," or "one of the finest . . . in the City" were mere puffing and not misrepresentations of material fact. *Prudential Ins. Co. of Am. v. Jefferson Associates, Ltd.*, 896 S.W.2d 156, 163 (Tex. 1995).

(39)    The evidence shows that Defendant did not make any express warranties to Plaintiffs. Defendant did not use Mrs. Jordan's sailboat as a model or example of an express warranty, and any statements Mr. Jordan made with respect to having "the best painter in the region" were mere puffery.

(40)    The Court finds that Defendant is not liable for breach of express warranty under the DTPA.

**V.  Defendant's Counterclaim for Attorney's Fees**

(41)   The Contract between the Parties contains a provision that states: "In the event any efforts of any kind are required of Hooking Bull Boatyard to enforce this agreement or interpret any of its terms, or for any breach of this agreement, Hooking Bull Boatyard shall be entitled to such amount from the owner for attorney's fees and costs expended." (Pl. Ex. 1, ¶ 18.)  Thus, Defendant contends that it is entitled to recover its attorney's fees from Plaintiffs for defending this action.

(42)   Parties to a contract may provide by agreement that in the event of a suit on the contract, the *prevailing party* is entitled to recover attorney's fees. *Probus Properties v. Kirby*, 200 S.W.3d 258, 265 (Tex. App.—Dallas 2006); *Head v. U.S. Inspect DFW, Inc.*, 159 S.W.3d 731, 749 (Tex. App.—Fort Worth 2005, no pet.). "The 'prevailing party' is the party who successfully prosecutes or defends the action on the main issue." *Probus Properties*, 200 S.W.3d at 265.

(43)   To waive or contract around the Texas attorney's fees statute requires specificity, and the Fifth Circuit has opined that "[i]t is entirely possible . . . that when the parties [to a contract] possess unequal bargaining power, the Texas courts will not permit the party in the dominant position to extract a waiver of the Texas legislature's pronouncement of the availability of attorney's fees in Section 38.001 *et seq*." *Id.*

(44)   The Contract provision regarding attorney's fees contains prefatory language—"In the event any efforts of any kind are required of Defendant Boatyard to enforce this agreement . . . ."—that implies Plaintiffs are only responsible for Defendant's attorney's fees if Plaintiffs are in breach, and Defendant must sue to enforce the Contract.

(45)   Defendant was the drafter of the Contract and the dominant party in this transaction and was also the breaching party. If Texas courts would not allow Defendant to draft around

21

Section 38.001 without explicit language, then it is absurd to conclude that Texas law would allow Defendant to trick Plaintiffs into being responsible for Defendant's attorney's fees, especially where Defendant breached the Contract.

(46)   The Court finds that Plaintiffs are not liable to Defendant on its counterclaim for attorney's fees.

## VI. Damages

### A. Contract Damages

(47)   Under Texas law, the proper measure of damages in breach-of-contract cases is just compensation for the loss or damage actually sustained, commonly referred to as the benefit of the bargain. *Bowen v. Robinson*, 227 S.W.3d 86, 96 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). Generally, "the complaining party is entitled to recover the amount necessary to put him in as good a position as if the contract had been performed." *Smith v. Kinslow*, 598 S.W.2d 910, 912 (Tex. Civ. App.—Dallas 1980, no writ) (citation omitted).

(48)   In contracts for the construction or repair of property, a plaintiff may recover the reasonable cost of remedying any defects in performance or of getting the whole job done elsewhere if there has been a complete failure of performance. *See Ashley v. Bizzell*, 694 S.W.2d 349, 353 (Tex. App.—San Antonio 1985, writ. ref'd n.r.e.). However, the complaining party cannot recover damages exceeding the amount he would have received had the contract not been broken. *Texas Pacific Coal & Oil Co. v. Stuard*, 7 S.W.2d 878, 881 (Tex. Civ. App.—Eastland 1928, writ. ref'd).

(49)   Plaintiffs are entitled to recover either the amount paid to Defendant, or the amount necessary to properly repaint the CURANDERO elsewhere, but not both. Plaintiffs have elected to recover the amount necessary to properly repaint the CURANDERO elsewhere.

(50)    Because Defendant only breached the Contract with respect to the above-waterline paint job, Plaintiffs are entitled to recover only the amount necessary to properly repaint the above-waterline hull of the CURANDERO. Defendant's expert admits that the vessel should be painted in a controlled environment to yield good results; therefore, it is not unreasonable for Plaintiffs to have the CURANDERO painted by Gulf Coast Composite, even though it charges additional fees for hauling the vessel over land, crane rental, and de-rigging and re-rigging the mast.

(51)    On August 12, 2008, Gulf Coast Composite estimated it would cost $15,463.52 to perform an above-waterline paint job on the CURANDERO. (*See* Pl. Ex. 31 at 2—3.)[4] Shortly after Hurricane Ike, on September 12, 2009, Gulf Coast Composite estimated it would cost $21,108.75 to perform an above-waterline paint job on the CURANDERO. (*See* Pl. Trial Ex. 46.) However, Defendant should not be liable for any increases in labor or materials due to Hurricane Ike, as the Coastal Bend region of Texas was not hit by Hurricane Ike.

(52)    The Court finds that Plaintiffs are entitled to recover $15,463.52 from Defendants in order to repaint the above-waterline hull of the CURANDERO.

**B.  DTPA Damages**

**1.  Mental Anguish Damages**

(53)    Under the DTPA, a prevailing plaintiff may recover damages for mental anguish. TEX. BUS. & COMM. CODE § 17.50(a). The amount of damages depends on the mental state of the defendant, as determined by the trier of fact. The plaintiff is not required to plead or prove that the defendant's wrongful action was willful or committed knowingly in order to recover mental anguish damages. *Milt Ferguson Motor Co. v. Zeretzke*, 827 S.W.2d 349, 357 (Tex. App.—San

---

4.   The Court has excluded the cost of the cove stripe from the total based on its earlier finding that Plaintiffs failed to offer any evidence that they requested a cove stripe from Defendant or paid Defendant for this service.

Antonio 1991, no writ.). However, if the defendant's conduct was committed knowingly, the plaintiff may recover mental anguish damages up to three times the amount of economic damages, and if the defendant's conduct was intentional, the plaintiff may recover damages up to three times the amount of damages for mental anguish and economic damages. TEX. BUS. & COMM. CODE § 17.50(b)(1).

(54)    There is no evidence that Defendant acted knowingly or intentionally with regard to any statement made to Plaintiffs or the work that was performed on the CURANDERO. Moreover, the Court previously granted summary judgment to Defendant with respect to Plaintiffs' claim for mental anguish damages because Plaintiffs failed to provide any evidence that they had actually suffered mental anguish or emotional distress as a result of Defendant's conduct. (*See* Dkt. No. 61.)

(55)    The Court finds that Plaintiffs are not entitled to recover any amount from Defendant for mental anguish damages.

### 2.  Economic Damages

(56)    A prevailing party under the DTPA is entitled to recover his economic damages resulting from the defendant's breach of an implied warranty. TEX. BUS. & COMM. CODE § 17.50(b)(1).

(57)    Loss-of-use damages are available under the DTPA where a plaintiff has been deprived of the use of his property. *See, e.g.*, *Luna v. North Star Dodge Sales, Inc.*, 667 S.W.2d 115 (Tex. 1984); *Town E. Ford Sales, Inc. v. Gray*, 730 S.W.2d 796 (Tex. App.—Dallas 1987, no writ); *Metro Ford Truck Sales, Inc. v. Davis*, 709 S.W.2d 785 (Tex. App.—Fort Worth 1986, writ ref'd n.r.e.). Loss-of-use damages are calculated by determining the rental value for a similar item while the damaged item is being repaired, even if the plaintiff does not actually rent

a substitute or show any amounts expended during the period of loss. *Luna*, 667 S.W.2d at 118. Calculation of damages "must of necessity . . . vary with the character of the property, and somewhat with the peculiar circumstances of the case." *Id.* at 119 (quoting *Craddock v. Goodwin*, 54 Tex. 578 (1881)). Loss-of-use damages will be limited to their typical use, as determined by the trier of fact. *Elias v. Mr. Yamaha, Inc.*, 33 S.W.3d 54, 62 (Tex. App.—El Paso 2000, no pet.).

(58)    The Court finds that Plaintiffs are entitled to recover loss-of-use damages in the amount of $7000.00 (representing $400/day x 2.5 days/week x 7 weeks) from Defendant. (*See* Admission of Fact No. 26.)

### 3. Other relief

(59)    The DTPA permits a court to provide "any other relief which the court deems proper, including . . . the revocation of a license or certificate authorizing a person to engage in business in this state if the judgment has not been satisfied within three months of the date of final judgment." TEX. BUS. & COMM. CODE §17.50(b)(4).

(60)    Plaintiffs request that the Court make revocation of Defendant's license a consequence of failing to pay any judgment rendered within three months of the date judgment is entered herein.

(61)    The Court finds that revocation of Defendant's license for failure to satisfy any judgment within three months is not proper in this case.

### C. Attorney's Fees

(62)    Where a plaintiff is successful in prosecuting his breach of contract claims, he is entitled to recover reasonable attorney's fees "in addition to the amounts of a valid claim and costs." TEX. CIV. PRAC. & REM. CODE § 38.001(8). "The law . . . existing at the time a contract

is made becomes a part of the contract and governs the transaction." *Tex. Nat'l Bank v. Sandia Mortgage Corp.*, 872 F.2d 692, 698 (5th Cir. 1989); thus, the Texas attorney's fees statutory scheme is a part of the Contract between Plaintiffs and Defendant, unless the Parties waived their right to recover attorney's fees under that section. *See id.*

(63)    The Contract between the Parties contains no provision waiving Plaintiffs' right to recover attorney's fees under Tex. Civ. Prac. & Rem. Code § 38.001(8), nor has Defendant presented any evidence that such a waiver occurred.

(64)    The DTPA also provides that prevailing parties are entitled to reasonable and necessary attorney's fees.  Tex. Bus. & Comm. Code §17.50(b)(4). However, Plaintiffs are only entitled to one recovery of attorney's fees.

(65)    The Court finds that Plaintiffs are entitled to recover reasonable attorney's fees in the amount of $60,000.00 from Defendant. (*See* Admission of Fact No. 24.)

**D.  Costs**

(66)    Where a plaintiff is successful in prosecuting his breach of contract claims, he is entitled to costs.  Tex. Civ. Prac. & Rem. Code § 38.001(8).

(67)    The Court finds Plaintiffs are entitled to recover their taxable costs in the amount of $7,050.00 from Defendant. (*See* Admission of Fact No. 23.)

**Conclusion**

For the foregoing reasons, Plaintiffs are entitled to judgment against Defendant for repair damages, loss of use while the CURANDERO is repaired, reasonable and necessary attorney's fees, and taxable costs of court.

Judgment shall therefore be rendered against Hooking Bull Boatyard, Inc. and in favor of the Plaintiffs, awarding $89,513.52 to Alan and Robin Dinn.

Defendant shall take nothing on its counterclaim for attorney's fees.

Defendant's Motion for Judgment as a Matter of Law (Dkt. No. 85) is **DENIED**.

It is so **ORDERED**.

Signed this 30th day of September, 2010.

_____
JOHN D. RAINEY
SENIOR U.S. DISTRICT JUDGE